2017 IL App (1st) 152817
No. 1-15-2817

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| SHARED IMAGING, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 12 L 51135 |
| | ) | |
| BRIAN HAMER, in His Official Capacity as | ) | |
| Director of Revenue; THE DEPARTMENT OF | ) | The Honorable |
| REVENUE; DAN RUTHERFORD, in His | ) | James M. McGing, |
| Official Capacity as Treasurer of the State of | ) | Judge Presiding. |
| Illinois, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Shared Imaging, LLC (Shared Imaging), instituted this action pursuant to the State Officers and Employees Money Disposition Act (30 ILCS 230/1 *et seq.* (West 2012)), seeking review of the Department of Revenue's (Department) determination that Shared Imaging owed $807,544.00 in back taxes, interest, and penalties under the Use Tax Act (Act) (35 ILCS 105/3-10 (West 2008)) for the period of January 1, 2008, through April 30, 2009 (the Period).

The parties filed cross-motions for partial summary judgment, and after a hearing, the trial court entered judgment against Shared Imaging and in favor of the Department.

¶ 2    On appeal, Shared Imaging argues that (1) some of its units were not subject to the use tax, because they were subject to the temporary storage exemption under the Act (35 ILCS 105/3-55(e) (West 2008)), (2) other units were not subject to the use tax, because they were subject to the expanded temporary storage exemption under the Act (35 ILCS 105/3-55(j) (West 2008)), (3) the Department's assessment of taxes was unconstitutional because it is not fairly apportioned under the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3), (4) if Shared Imaging does owe use tax, it is entitled to a credit for taxes paid to other states, (5) if Shared Imaging does owe use tax, the tax base must be reduced for depreciation, and (6) all late filing and late payment penalties should be abated because Shared Imaging had good cause for not paying its use tax. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                  BACKGROUND

¶ 4    The record reveals the following. Shared Imaging is a limited liability company with its principal place of business in Streamwood, Illinois, and engages in the business of leasing trailers and other mobile equipment outfitted with medical devices and instruments, such as MRI machines. Shared Imaging leases its equipment to customers both within and outside of Illinois. The length of the leases varies greatly and can be as short as a few days to as long as a few years.

¶ 5    In June 2012, following an audit, the Department issued notices of liability to Shared Imaging, stating that on 11 of its units purchased during the Period (Units 52, 55, 229, 231, 553,

579, 582, 585, 587, 588, and 591), Shared Imaging owed $305,873.00 in use tax, $433,447.00[1] in penalties (for fraud, late payment, and late filing), and $68,224 in interest. Shared Imaging paid the total assessed—$807,544.00—under protest.

¶ 6        Shared Imaging then filed suit against the Department, its then-director Brian Hamer, and then-Illinois treasurer, Dan Rutherford, seeking review of the Department's assessment of the use tax against the units at issue. Shared Imaging's first amended verified complaint contained ten counts, alleging the following: Shared Imaging was entitled to a preliminary injunction enjoining the defendants from transferring Shared Imaging's protest payment out of the state protest fund or otherwise continuing collection of the assessed taxes (count I); the units at issue were not subject to the use tax because they were not used in Illinois (count II); the units at issue qualified for the temporary storage exemption (and expanded temporary storage exemption) under the Act (count III); Shared Imaging was entitled to a credit against the assessed taxes for taxes paid to other states (count IV); Shared Imaging was entitled to a deduction in the tax base for depreciation (count V); the Department's tax assessment was not fairly apportioned (count VI); Shared Imaging should not have to pay any penalties because it had reasonable cause for not timely paying the use taxes (count VII); the Department's assessment of double interest and penalties under the Tax Delinquency Amnesty Act (Amnesty Act) (35 ILCS 745/1 *et seq.* (West 2008)) violated due process (count VIII); the Department's assessment of double interest and penalties under the Amnesty Act was unlawful because the Amnesty Act violates the federal excessive fines clause (U.S. Const., amend. VIII) (count IX); and the double interest should be

---

[1]Throughout its filings in the trial court and its briefs on appeal, Shared Imaging states that the total amount of penalties assessed was $443,447.00. Review of the notices of liability, however, reveals this to be error, as the total amount penalties assessed was actually $433,447.00. This is consistent with Shared Imaging's claim that it paid a total of $807,544.00 to the Department under protest.

abated because it was, in essence, a penalty and Shared Imaging had reasonable cause for its failure to pay the assessed taxes (count X).

¶ 7        Shared Imaging moved for partial summary judgment on the issues of whether the units at issue were subject to the temporary storage exemption and the expanded temporary storage exemption (count III), the Department's assessment was fairly apportioned (count VI); Shared Imaging was entitled to a credit for taxes paid to other states (count IV); Shared Imaging was entitled to a tax base deduction for depreciation (count V); and late payment, late filing, and fraud penalties should be abated (count VII). The defendants filed a response and cross-motion for summary judgment on the same grounds.

¶ 8        After taking a reply from Shared Imaging and hearing the oral arguments of both sides, the trial court granted summary judgment in favor of the defendants on counts III, IV, V, and VI. The trial court also granted the defendants summary judgment on count VII with respect to the late filing and late payment penalties but granted summary judgment to Shared Imaging on the issue of the fraud penalties. Thereafter, Shared Imaging filed a motion to correct the record on the basis that the copies of the trial court's decision issued to Shared Imaging and the defendants was not the same. Shared Imaging also filed a motion requesting that the trial court enter a Supreme Court Rule 304(a) (eff. Feb. 26, 2010) finding.

¶ 9        On September 29, 2015, the trial court entered its "Corrected Opinion and Order," which corrected the discrepancy in the original decision and also contained the statement that "[t]his Opinion and Order is Final and Appealable." On the same date, the trial court issued a handwritten order, stating that Shared Imaging's motions to correct the record and for a Rule 304(a) finding were granted. In that order, the trial court stated that there was "no just cause for delay of enforcement or appeal of the final order entered separately on this day."

¶ 10    Shared Imaging filed its notice of appeal on October 1, 2015.

¶ 11    On appeal, Shared Imaging cited only the "Corrected Opinion and Order" in its jurisdictional statement. Accordingly, we initially dismissed Shared Imaging's appeal for lack of jurisdiction on the basis that the "Corrected Opinion and Order" did not contain a sufficient Rule 304(a) finding. Thereafter, Shared Imaging filed a petition for rehearing in which it cited, for the first time, the second September 29, 2015, order, which did contain a sufficient Rule 304(a) finding. We granted that petition for rehearing.

¶ 12                                STANDARD OF REVIEW

¶ 13    Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016)). Although the filing of cross-motions for summary judgment does not necessarily establish the lack of an issue of material fact or obligate a court to render summary judgment, it does indicate that the parties agree that the case involves a question of law and that they invite the court to decide the issues based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Our review of a trial court's summary judgment determination is *de novo*. *Id.* at ¶ 30. "[T]his court may affirm a trial court's grant of summary judgment on any basis apparent in the record, regardless of whether the trial court relied on that basis or whether the court's reasoning was correct." *Harlin v. Sears Roebuck & Co.*, 369 Ill. App. 3d 27, 31-32 (2006).

¶ 14    The issues presented in this case require us to interpret various provisions of the Act. Matters of statutory interpretation are also reviewed *de novo*. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 377 (2008).

¶ 15                                    ANALYSIS

¶ 16            On appeal, Shared Imaging argues that (1) Units 229, 231, and 588 were not subject to the use tax, because they were subject to the temporary storage exemption under the Act (35 ILCS 105/3-55(e) (West 2008)), (2) Units 52, 55, 553, 579, 582, 585, 591 were not subject to the use tax, because they were subject to the expanded temporary storage exemption under the Act (35 ILCS 105/3-55(j) (West 2008)), (3) the Department's assessment of taxes was unconstitutional because it was not fairly apportioned under the federal Commerce Clause, (4) if Shared Imaging did owe use tax, it was entitled to a credit for taxes paid to other states, (5) if Shared Imaging did owe use tax, the tax base must be reduced for depreciation, and (6) all late filing and late payment penalties should be abated because Shared Imaging had good cause for not paying its use tax.

¶ 17                                    Jurisdiction

¶ 18            We will address all of these contentions in turn. Before doing so, however, we address the issue that has led to our granting of Shared Imaging's petition for rehearing: our jurisdiction. We initially dismissed this appeal for lack of jurisdiction based on our belief that the trial court had not entered a sufficient finding pursuant to Supreme Court Rule 304(a), because the September 29, 2015, "Corrected Order and Opinion" simply stated that the order was "final and appealable." This mistaken belief was a result of Shared Imaging's blatant failure to comply with Illinois Supreme Court Rule 341(h)(4)(ii) (eff. Jan. 1, 2016).

¶ 19            Appellants have the burden of establishing appellate jurisdiction. *U.S. Bank National Association v. IN Retail Fund Algonquin Commons, LLC*, 2013 IL App (2d) 130213, ¶24. Accordingly, Rule 341(h)(4)(ii) requires that all appellants include the following in their opening briefs:

"a brief, but precise statement or explanation under the heading 'Jurisdiction' of the basis for appeal including the supreme court rule or other law which confers jurisdiction upon the reviewing court; *the facts of the case which bring it within this rule or other law*; and the date that the order being appealed was entered and any other facts which are necessary to demonstrate that the appeal is timely. In appeals from a judgment as to all the claims and all the parties, the statement shall demonstrate the disposition of all claims and all parties. *All facts recited in this statement shall be supported by page references to the record on appeal*." (Emphases added.) Ill. S. Ct. R. 341(h)(4)(ii) (eff. Jan. 1, 2016).

Shared Imaging's jurisdictional statement failed to comply with the emphasized language: it failed to state the facts of the case that brought it within Rule 304(a), and it failed to support its statements with page references to the record on appeal.

¶ 20      It would seem to us to be readily apparent that an appellant claiming jurisdiction under Rule 304(a) should clearly reference the order (including record citation) in which the trial court made its Rule 304(a) finding, especially when specifically directed by Rule 341(h)(4)(ii) to include in its jurisdictional statement all facts that bring the case within the ambit of Rule 304(a). It appears that Shared Imaging did not share our opinion. Although claiming jurisdiction in this court pursuant to Rule 304(a), the only order referenced in Shared Imaging's jurisdictional statement is the September 29, 2015, "Corrected Opinion and Order." Shared Imaging failed to include any reference to a second order of September 29, 2015, containing a Rule 304(a) finding, nor does the jurisdictional statement include any record citation to the second September 29, 2015, order (in fact, the jurisdictional statement contains no record citations whatsoever).

¶ 21      This failure is especially problematic in situations such as these, where the "Corrected Opinion and Order" contained a statement by the trial court that the order was "final and

appealable"—language often used by trial courts and parties in failed attempts to make a Rule 304(a) finding. See *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill. App. 3d 539, 544 (2011) (citing numerous cases holding that the phrase "final and appealable" does not qualify as a Rule 304(a) finding). In addition, there is no reference to the second September 29, 2015, order in Shared Imaging's statement of facts; it is not included in the appendix, and it is not referenced in or attached to Shared Imaging's notice of appeal. Anyone reading Shared Imaging's brief would never even know such an order existed. Instead, one would be led to believe that the "final and appealable" language found in the "Corrected Opinion and Order"—the only order ever referenced by Shared Imaging in support of jurisdiction—was the intended Rule 304(a) finding that formed the basis for Shared Imaging's claim of jurisdiction based on that rule.

¶ 22    The brief contents required by Rule 341(h) are not intended as academic exercises or meaningless busywork for appellants. They serve a purpose, and when appellants fail to comply with the Rules, that purpose is thwarted. Were this not an issue of jurisdiction, the dismissal of Shared Imaging's appeal could be considered invited error. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) ("[A] party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings."). Moreover, appellants who have failed to comply with Rule 341 have seen their contentions waived, briefs stricken, and appeals dismissed. See *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18 ("Where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal."); *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 208-09 (2007) (failure to comply with Rule

341(h)(7) results in waiver of contentions). To avoid these consequences in the future, we strongly urge that Shared Imaging take greater effort to comply with Supreme Court 341(h) in the future. "[T]he rules of this court neither are aspirational nor are they mere suggestions; '[t]hey have the force of law, and the presumption must be that they will be obeyed and enforced as written.' " *Robidoux v. Oliphant*, 201 Ill. 2d 324, 340 (2002) (quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995)).

¶ 23                                                  Use Tax Act

¶ 24        The Act imposes a tax "upon the privilege of using in this State tangible personal property purchased at retail from a retailer." 35 ILCS 105/3 (West 2008). This use tax intended to serve as a complement to the Retailers' Occupation Tax Act (35 ILCS 120/1 *et seq.* (West 2008)), which is the primary means by which Illinois taxes retail sales of tangible goods. The purpose of the use tax is to preclude buyers from avoiding the retailers' occupation tax by making purchases from out-of-state vendors and to protect Illinois vendors from lost sales to those out-of-state vendors. *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332, 340 (2010).

¶ 25        The resolution of the issues in this matter requires us to interpret various provisions of the Act. The most basic of rules governing the interpretation of statutes is that our role is to ascertain and effectuate the legislature's intent. *Hamilton v. Industrial Commission*, 203 Ill. 2d 250, 255 (2003). The best indicator of that intent is the language of the statute when given its plain and ordinary meaning. *Id.* In the process of interpreting a statute, "[n]o sentence, clause, or word should be interpreted in a way that renders it superfluous or meaningless." *McTigue v. Personnel Board of the City of Chicago*, 299 Ill. App. 3d 579, 589 (1998). "[S]tatutes exempting property

from taxation must be strictly construed." *Nutrition Headquarters, Inc. v. Department of Revenue*, 123 Ill. App. 3d 997, 999 (1984).

¶ 26                                    Units 553, 582, and 587

¶ 27        In its response brief, the Department concedes that Units 553, 582, and 587 were never stored or otherwise used in Illinois and, thus, Shared Imaging was improperly assessed a use tax with respect to those units. Although Shared Imaging agrees that Units 553 and 582 were never used in Illinois, it contends that Unit 587 was leased in Illinois.[2] Accordingly, although the Department was willing to concede $170,539.00 in taxes, penalties, and interest, that amount should be reduced to $79,567.00, which represents the use tax, interest, and late payment and late filing penalties imposed for Units 553 and 582 (fraud penalties are not at issue in this appeal and, therefore, are not considered).

¶ 28        With respect to Unit 587, Shared Imaging admits that it was leased in Illinois and makes no argument on appeal that it was subject to any exemption from the Act. Shared Imaging does argue with respect to Unit 587, however, that it was entitled to a credit for out-of-state taxes paid on the unit and a deduction for depreciation. We will address these contentions when we address Shared Imaging's arguments regarding its entitlement to credit and depreciation deductions with respect to all of the units.

¶ 29                                    Temporary Storage Exemption

¶ 30        We move now to Shared Imaging's first substantive contention on appeal, which is that Units 229, 231, and 588 were exempt from the use tax under the temporary storage exemption.

---

[2]We note that in support of its contention that Unit 587 was leased inside Illinois, Shared Imaging cited a span of 113 pages of the record, *i.e.*, all of the leases pertaining to Unit 587, rather than the specific lease or leases demonstrating that the unit was leased inside Illinois. Again, we direct Shared Imaging to Illinois Supreme Court Rule 341(h) (eff. Jan. 1, 2016), specifically Rule 341(h)(7)'s requirement that appellants are to cite to the pages of the record where evidence supporting the appellant's argument may be found. Citation to a large swath of the record is no more helpful in our review than failing to cite any part of the record at all.

Under that exemption, the Act provides that the use tax does not apply under the following circumstances:

"The temporary storage, in this State, of tangible personal property that is acquired outside this State and that, after being brought into this State and stored here temporarily, is used solely outside this State or is physically attached to or incorporated into other tangible personal property that is used solely outside this State, or is altered by converting, fabricating, manufacturing, printing, processing, or shaping, and, as altered, is used solely outside this State." 35 ILCS 105/3-55(e) (West 2008).

As it applies to the units in this case, the temporary storage exemption has three requirements: they must be (1) purchased outside of Illinois, (2) stored temporarily in Illinois, and (3) then used solely outside of Illinois.

¶ 31    Shared Imaging argues that Units 229, 231, and 588 qualify for this exemption because they were purchased outside of Illinois and were each stored in Illinois for less than two months before being leased exclusively outside of Illinois during the Period. There is no dispute that Units 229, 231, and 588 meet the first requirement, as the record demonstrates that all three were purchased outside of Illinois. Rather, the parties spend much of their time arguing over whether the storage of the units in Illinois immediately following their purchase was "temporary" under the Act. The Department contends that Units 229, 231, and 588 were not temporarily stored in Illinois because their initial post-purchase storages lasted 28 days, 18 days, and 47 days, respectively, and those time frames do not qualify as temporary. Shared Imaging argues, on the other hand, that they were only temporarily stored because they were stored for a limited time and then were leased outside of Illinois.

¶ 32       The Act does not define temporary storage and there is a dearth of case law on the topic. "In the absence of a statutory definition indicating a different legislative intent, words are to be given their ordinary and commonly understood meaning." *Cojeunaze Nursing Center v. Lumpkin*, 260 Ill. App. 3d 1024, 1029 (1994). Dictionaries may be used to ascertain the ordinary and commonly understood meaning of a word. *Id.* The New College Edition of the American Heritage Dictionary defines the word temporary as "Lasting, used, or enjoyed for a limited time; impermanent; transient." American Heritage Dictionary 1325 (1981). Under this definition, we conclude that the storage of Units 229, 231, and 588 immediately following their purchases was temporary in nature.

¶ 33       Units 229, 231, and 588 were stored in Illinois following their purchase for no more than 47 days before they were leased to customers outside of Illinois. The uncontested affidavit of Brady Goetz, Controller of Shared Imaging, states that Shared Imaging purchased the units "for the purpose of transporting them to other states for lease solely outside Illinois during the Periods in Issue." Although we decline to set any bright line rule regarding what span of time constitutes "temporary storage," we believe that the storage of Units 229, 231, and 588 for no more than 47 days while awaiting transport to out-of-state lessees falls within the scope of a "limited time," "impermanent," and "transient."

¶ 34       The Department relies on *Nutrition Headquarters, Inc. v. Department of Revenue*, 106 Ill. 2d 58 (1985), for its contention that the amount of time that Units 229, 231, and 588 were stored in Illinois immediately following their purchase was too long to be considered temporary. In *Nutrition Headquarters*, the taxpayer operated a mail-order vitamin and health food business headquartered in Illinois. Its catalogs were printed and stamped for mailing in states outside of Illinois but then were labeled with customers' names and addresses, sorted, and mailed from

Illinois. The Department contended that these activities constituted use under the Act and attempted to impose a use tax on the catalogs. *Id.* at 59-60. The Illinois Supreme Court disagreed, finding that the temporary storage exemption applied. *Id.* at 63. In so holding, the court noted that the catalogs made only a "brief stop" in Illinois. *Id.* at 61.

¶ 35　　　　It is this "brief stop" language on which the Department relies in arguing that the 18 to 47 days spent in Illinois by Units 229, 231, and 588 did not fall within the definition of temporary. The fault in the Department's argument, however, is that the court in *Nutrition Headquarters* did not define "brief stop." Accordingly, we have no way of knowing whether the catalogs were in Illinois for a longer or shorter period of time than Units 229, 231, and 588 were. Therefore, *Nutrition Headquarters* does not dictate, as the Department contends, a finding that Units 229, 231, and 588 were not temporarily stored in Illinois.

¶ 36　　　　The Department also argues that the units were more than just temporarily stored while in Streamwood; according to the Department, Units 229, 231, and 588 also underwent "inspection" there. In support of this assertion, the Department cites to a sentence in the statement of facts in Shared Imaging's opening brief on appeal. That sentence reads, "Before a long-term lease, the asset may or may not be shipped to Shared Imaging's Streamwood location for inspection or temporary storage before lease outside of the state." That statement in no way demonstrates that Units 229, 231, and 588 were, in fact, inspected while in Streamwood. Although it is a theoretical possibility that they were, the Department has offered no evidence to counter Shared Imaging's evidence that Units 229, 231, and 588 were simply stored in Streamwood prior to being transported out of state to fulfill leases. Accordingly, this contention has no merit.

¶ 37　　　　With respect to the third requirement of the temporary storage exemption—that the units be used solely outside of Illinois following their temporary storage in Illinois—Shared Imaging

argues that Units 229, 231, and 588 were used solely outside of Illinois because they were leased solely outside of Illinois during the Period, did not return to Illinois during the Period, and when they did return, were only passively stored at the Streamwood location until they were again leased outside of Illinois. Although each of these contentions might be true, none of them satisfy the third requirement of the temporary storage exemption, because the return of Units 229, 231, and 588 to Illinois, even just for storage, defeats the requirement that they be solely used outside of Illinois.

¶ 38     The term "use" is defined by the Act in relevant part as "the exercise by any person of any right or power over tangible personal property incident to the ownership of that property." 35 ILCS 105/2 (West 2008). Storage of tangible personal property qualifies as a use of that property, because placing property in storage and maintaining the storage of that property represents an exercise of rights and power over the property that belongs only to the owner of the property. It goes without saying that a person who has no ownership interest in a piece of property cannot choose to put the property into storage or dictate how long said property will remain in storage; that power belongs uniquely to the owner of the property.

¶ 39     Moreover, the fact that the Act includes specific exemptions for circumstances involving storage indicates that the term "use" was intended to generally include storage. After all, if storage does not constitute use in the first place, then there is no need for specific exemptions for temporary storage. To read the Act in such a manner as to exclude storage from the definition of use would be to read out the temporary storage and expanded temporary storage exemptions and render them meaningless. See *McTigue*, 299 Ill. App. 3d at 589 ("No sentence, clause, or word should be interpreted in a way that renders it superfluous or meaningless."); *First National Bank*

*of Marengo v. Loffelmacher*, 236 Ill. App. 3d 690, 695 (1992) (declining to interpret a statutory provision in a manner that would render exceptions to the general rule meaningless).

¶ 40    The record on appeal demonstrates that, although Units 229, 231, and 588 remained outside of Illinois during the Period following their initial post-purchase storage in Illinois, they did eventually return to the Streamwood location. More specifically, Unit 229 returned to Illinois from Wyoming in November 2009, Unit 231 was picked up from Georgia for delivery to Illinois in February 2011, and Unit 588 returned from Oklahoma in September 2009. Although Shared Imaging contends that these units would have been stored in Illinois until they were next leased to an out-of-state customer, there is nothing in the record that demonstrates whether these units were subsequently leased following their return to Illinois and, if they were, whether they were leased to Illinois or out-of-state lessees. To this extent, the return of Units 229, 231, and 588 for storage until their next lease appears to be no more than the return of the units to Shared Imaging's rental inventory. See 86 Ill. Adm. Code 150.310(a)(6)(A)(iii), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008) ("[I]n Illinois, lessors are deemed to be the users of items purchased for rental inventories and placing an item in a rental inventory does not constitute storage [subject to exemption]."). Accordingly, whether later leased in or outside Illinois, the return of the units to Illinois for storage demonstrates that they were not solely used outside of Illinois following their initial post-purchase storage, because, as discussed, storage constitutes use under the Act.

¶ 41    Shared Imaging makes a number of arguments against our interpretation of the term "use" and our determination that Units 229, 231, and 588 were not used solely outside of Illinois. First, Shared Imaging contends that mere storage does not constitute use under the Act. In support, Shared Imaging points out that the Act does not specifically include storage in the

definition of use like other states' statutes have done. We fail to see what relevance the phraseology of other states' statutes has to do with the interpretation of the plain language of the Illinois statute. As explained above, storage is clearly the exercise of a right and power incident to ownership, and to interpret the term "use" as excluding storage would be to render several exemptions in the Act meaningless. Shared Imaging does not provide any other support for this contention, except for its own belief that the term "use" does not include storage. For this reason and for those discussed above, we find no merit in this contention.

¶ 42     Shared Imaging also argues that Units 229, 231, and 588 were used solely outside of Illinois because they did not return to Illinois within the Period. We agree that the record demonstrates that the return of the units at issue did not occur until after April 30, 2009, but we fail to see the relevance of this position. Shared Imaging cites no authority in support of its position, and nothing in the exemption suggests that the application of the exemption is analyzed on a tax-period-by-tax-period basis. Rather, the plain language of the exemption states that the property must be used solely outside of Illinois, period, suggesting that the property must *always* be used outside of Illinois, without limitation. This is consistent with the nature of a use tax, which is a "one-time tax imposed upon a discrete event (the purchase of the tangible property) for the privilege of unlimited use of that property in state." *Irwin Industrial Tool Co. v. Department of Revenue*, 394 Ill. App. 3d 1002, 1021 (2009); see also *Philco Corp. v. Department of Revenue*, 40 Ill. 2d 312, 319-20 (1968) ("[The use tax] is a nonrecurrent tax; once the tax is paid, the owner of the property may use it in Illinois, continuously or intermittently, without incurring a further use tax."). The use tax is triggered by the purchase of the property (Units 229, 231, and 588 were purchased within the Period), and the temporary storage exemption either applies or does not apply, depending on the use of the property. Although the

exemption might apply for a period of time, a change in the use of the property, even if it takes place outside of the initial tax period, can render an exemption inapplicable. See, *e.g.*, 86 Ill. Adm. Code 150.310(a)(6)(F), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008) (stating that property initially believed to be subject to the expanded temporary storage exemption will be subject to the use tax if it subsequently returns to and is used in Illinois).

¶ 43　　　　Next, Shared Imaging contends that even if Units 229, 231, and 588 did return to Illinois, they were returned only for temporary storage, which is exempted under the temporary storage exemption and nothing in the Act indicates that a taxpayer can temporarily store property in Illinois only once. First, we note that Shared Imaging's choice to phrase this argument in the context of "even if" the units returned to Illinois is a bit disingenuous, as it is Shared Imaging's own exhibits in support of summary judgment that clearly demonstrate that Units 229, 231, and 588 returned to Illinois. More importantly, however, Shared Imaging's argument that there is no limit on the number of times a taxpayer may temporarily store property in Illinois is incorrect: the temporary storage exemption clearly places that limit on the taxpayer by providing that after the initial post-purchase temporary storage of property, that property must be used "*solely*" outside of Illinois. Given that the term "use" includes storage, the return of property to Illinois— even if only for storage—constitutes use occurring inside Illinois. Therefore, although the temporary storage exemption permits the initial post-purchase storage of property, it prohibits the further storage (*i.e.*, use) of property in Illinois absent the payment of the use tax.

¶ 44　　　　Shared Imaging also points out that the temporary storage exemption permits taxpayers, without forfeiting the exemption, to physically attach or incorporate the property into other property that is solely used outside of Illinois or to alter the property by converting, fabricating, manufacturing, printing, processing, or shaping for use solely outside of Illinois. According to

Shared Imaging, because passive storage is much less active and invasive than such activities, it should not be held to have forfeited the temporary storage exemption by the return of Units 229, 231, and 588 for further storage. We find this contention unavailing because, regardless of whether Shared Imaging chooses to store, attach, alter, or shape the units, the exemption permits it to do so only once tax free prior to sending the property out of state for use. If Shared Imaging returns the property to Illinois and engages in the same activity again, the exemption no longer applies. In addition, Shared Imaging fails to explain why it is that, just because it engages in a more passive use of its property than is permitted, it should be excused from the requirement that the property must thereafter be used solely outside of Illinois. We certainly see no relationship between the two.

¶ 45    Finally, Shared Imaging argues that under the Department's regulations and our interpretation of the Act, if Shared Imaging were to lease its units to exempt hospitals (86 Ill. Adm. Code 150.331(b) (2002)), it would not be subject to the use tax, but if it merely stores the units, it is subject to the use tax. According to Shared Imaging, this distinction "underscores the dubiousness of the Department's position." We see nothing dubious about the Department using tax incentives to encourage the leasing of medical equipment to tax exempt hospitals for the treatment of sick and injured Illinois citizens and visitors, while taxing the use of property that benefits from Illinois services (police, fire, roads, and other infrastructure) but is not actively contributing to the well-being of the State.

¶ 46    In sum, because storage qualifies as a use of tangible personal property under the Act and because the return of Units 229, 231, and 588 to Illinois for additional storage defeats the temporary storage exemption requirement that the property be used solely outside of Illinois after its initial post-purchase storage in Illinois, we conclude that the temporary storage exemption did

not apply to Units 229, 231, and 588. Accordingly, the Department properly assessed a use tax on the purchase of these units.

¶ 47                              Expanded Temporary Storage Exemption

¶ 48        Next, Shared Imaging argues that Units 52, 55, 579, 585, and 591[3] were exempt from the use tax under the expanded temporary storage exemption found in section 3-55(j) of the Act (35 ILCS 105/3-55(j) (West 2008)). That exemption provides as follows:

> "Beginning on January 1, 2002 and through June 30, 2011, the use of tangible personal property purchased from an Illinois retailer by a taxpayer engaged in centralized purchasing activities in Illinois who will, upon receipt of the property in Illinois, temporarily store the property in Illinois (i) for the purpose of subsequently transporting it outside this State for use or consumption thereafter solely outside this State or (ii) for the purpose of being processed, fabricated, or manufactured into, attached to, or incorporated into other tangible personal property to be transported outside this State and thereafter used or consumed solely outside this State. The Director of Revenue shall, pursuant to rules adopted in accordance with the Illinois Administrative Procedure Act, issue a permit to any taxpayer in good standing with the Department who is eligible for the exemption under this subsection (j). The permit issued under this subsection (j) shall authorize the holder, to the extent and in the manner specified in the rules adopted under this Act, to purchase tangible personal property from a retailer exempt from the taxes imposed by this Act. Taxpayers shall maintain all necessary books and records to substantiate the use and consumption of all such tangible personal property outside of the State of Illinois." 35 ILCS 105/3-55(j) (West 2008).

---

[3]In its opening brief, Shared Imaging also included Units 553 and 582 in this contention. Subsequently, however, the Department conceded that it had improperly taxed those units and agreed that Shared Imaging was entitled to a refund of the taxes, interest, and late filing and late payment penalties paid on those units.

¶ 49    With respect to Unit 579, Shared Imaging argues that the expanded temporary storage exemption applies because once transferred out of Illinois, Unit 579 never returned. As for the remaining Units, Shared Imaging argues that even though they eventually returned to Illinois for storage, they were only temporarily stored in Illinois. There is no need to distinguish between the various units with respect to the application of this exemption, because Shared Imaging's claim to the expanded temporary storage exemption fails because Shared Imaging did not possess the required permit at the time it purchased the units.

¶ 50    As the language of the exemption makes clear, the Director of Revenue is to issue permits to any taxpayer who is in good standing and qualifies for the exemption. It is this permit that authorizes a taxpayer to purchase property without being subject to the use tax. *Id.* In addition, the Department's regulations promulgated under this section make clear that the permit is a necessity before the expanded temporary storage exemption may be claimed by a taxpayer: "Persons who wish to take advantage of this expanded temporary storage exemption *must* apply in writing to the Department to obtain an Expanded Temporary Storage Permit." (Emphasis added.) 86 Ill. Adm. Code 150.310(a)(6)(C), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008). "*Persons holding a valid Expanded Temporary Storage Permit* may claim the expanded temporary storage exemption ***." (Emphasis added.) 86 Ill. Adm. Code 150.310(a)(6)(D), amended at 32 Ill. Reg. 17754 (eff. Oct. 24, 2008).

¶ 51    Despite these clear directives, Shared Imaging did not obtain a permit until February 1, 2014, years after all of the units at issue were purchased. Nevertheless, Shared Imaging argues that we should overlook its failure to timely obtain a permit, because the fact that it was issued a permit at all—even years later—confirms that it was engaged in "centralized purchasing activities." In addition, Shared Imaging contends that to require a permit would be to elevate

form over substance, ignores the fact that Shared Imaging otherwise met all the requirements of the expanded temporary storage exemption, and defeats the purpose of avoiding taxation where property is merely stored in Illinois.

¶ 52    We find no merit to any of Shared Imaging's contentions in this respect. First, to the extent that the issuance of the permit confirms Shared Imaging's status as a centralized purchaser, it only did so as of the time the permit was issued—February 2014. All of the units that Shared Imaging contends are subject to the expanded temporary storage exemption were purchased in 2008 or 2009. Thus, the fact that Shared Imaging might have been considered a centralized purchaser in 2014 has no bearing on whether it was engaged in centralized purchasing activities in 2008 and 2009. Second, with respect to the contentions that requiring a permit elevates form over substance and ignores the fact that Shared Imaging met all of the other requirements for the exemption, Shared Imaging has cited no authority for the position that substantial—and not full—compliance with the requirements of the exemption is acceptable. Such a position is akin to arguing that requiring a valid license to drive a motor vehicle elevates form over substance and that a person who has not been issued a valid driver's license should not be cited, so long as that person can demonstrate that they would have passed the driving test had they taken it. Finally, we disagree that requiring a permit defeats the purpose of the exemption. Like every other exemption to the Act, the expanded temporary storage exemption excuses a taxpayer from liability under the Act if and when the taxpayer meets the specific requirements of the exemption. Shared Imaging failed to meet those requirements and, thus, fails to fall within the scope of taxpayers intended to be excused from liability, much the same way a taxpayer who did not engage in centralized purchasing activities would not fall within the scope of taxpayers intended to be excused from liability under the Act.

¶ 53        Accordingly, because Shared Imaging failed to comply with the requirements of the expanded temporary storage exemption, the exemption does not apply to Units 52, 55, 579, 585, and 591.

¶ 54                              Fair Apportionment

¶ 55        Shared Imaging next contends that the Department's assessment of taxes is unconstitutional because it is not fairly apportioned under the federal commerce clause (U.S. Const., art. I, § 8, cl. 3). The commerce clause gives Congress the power to regulate interstate commerce but has also been interpreted as prohibiting states from taxing interstate commerce in an unduly restrictive or discriminatory manner, even when Congress has failed to legislate on the topic. *Irwin*, 238 Ill. 2d at 341. In assessing whether a state tax offends the strictures of the commerce clause, we apply the four-part test set forth in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977): (1) the activity taxed has a substantial nexus with the taxing state, (2) the tax is fairly apportioned, (3) the tax does not discriminate against interstate commerce, and (4) the tax is fairly related to the services provided by the state. See *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 183 (1995).

¶ 56        Shared Imaging argues that the use tax in this case fails the fair apportionment factor of the *Complete Auto* test. Under that factor, a tax is fairly apportioned if it is both internally and externally consistent. Internal consistency exists when the tax is structured in such a way that if all states were to impose an identical tax, no multiple taxation would result. *Irwin*, 238 Ill. 2d at 346. External consistency, on the other hand, examines whether the tax applies only to the portion of revenue that reasonably reflects the in-state portion of the activity being taxed. *Id.* According to Shared Imaging, the use tax here is not fairly apportioned because the units were

only temporarily stored in Illinois, did not generate any Illinois revenue, and were not involved in any economic activity in Illinois, yet the use tax taxes the entire value of the units.

¶ 57     Our supreme court in *Irwin* has already addressed this issue and clearly held, consistent with a long line of Illinois and other states' case law, that because the Act provides a credit for sales and use taxes paid to other states, the danger of multistate taxation is averted and the fair apportionment requirement is satisfied. *Id.* at 347-51. Nevertheless, Shared Imaging attempts to distinguish *Irwin* on two grounds. First, Shared Imaging argues that the *Irwin* court reached its decision based on the fact that the taxpayer in that case had not paid taxes on the airplane at issue in any other state, while Shared Imaging did pay taxes to other states on the units at issue. This is a misleading contention, as it fails to accurately state the basis for the court's holding: "[W]e conclude that Illinois' use tax based on the full purchase price of the airplane is externally consistent and thus fairly apportioned because no tax has been paid on the airplane to any other state, and *even if it had been, the Use Tax Act provides an exemption for sales or use taxes paid to other states*." (Emphasis added.) *Id.* at 351. Although the *Irwin* court did note that the taxpayer had not paid any other states' taxes, that was not a necessary factor in its decision, because even if the taxpayer had not, the fair apportionment argument was defeated by the presence of a credit provision in the Act.

¶ 58     Second, Shared Imaging argues that, unlike the units at issue in this case, the airplane in *Irwin* served its corporate purpose in Illinois by providing transportation services, at least part of the time in Illinois. The units at issue here, however, did not, because they were, according to Shared Imaging, "merely temporarily stored" in Illinois. Even without addressing the merit of Shared Imaging's contention that the units at issue in this case were "merely temporarily stored" in Illinois, this distinction is one without a difference. Whether the airplane in *Irwin* did or did

not fulfill its purpose in Illinois was not a consideration in the court's analysis of whether the tax was fairly apportioned. Rather, the court focused on the existence of the credit provision in the Act, and Shared Imaging's argument regarding where an object's corporate purpose is fulfilled does nothing to alter the fact that the Act contains a credit provision.

¶ 59    In accordance with *Irwin* and the cases cited therein, we conclude that the existence of the credit provision in the Act satisfies the fair apportionment requirement of the *Complete Auto* test and, thus, that Shared Imaging's contention in this respect fails.

¶ 60                                    Credit

¶ 61    Shared Imaging next contends that if it is subject to a use tax on the units, it is entitled to credit for the taxes paid to other states. Under the Act, the use tax does not apply to the following:

> "The use, in this State, of tangible personal property that is acquired outside this State and caused to be brought into this State by a person who has already paid a tax in another State in respect to the sale, purchase, or use of that property, to the extent of the amount of the tax properly due and paid in the other State." 35 ILCS 105/3-55(d) (West 2008).

In *Philco Corp.*, 40 Ill. 2d at 327, our supreme court indicated that this provision should not be interpreted too literally so as to defeat its purpose of avoiding multistate taxation. Accordingly, in *Philco*, the court held that the taxpayer was entitled to credit for sales taxes previously paid in Missouri, even though they were paid by the taxpayer's lessees and not the taxpayer itself. *Id.*

¶ 62    With respect to Units 229, 231, and 588, when they were returned to Illinois for further storage they ceased to be used solely outside of Illinois, and thus, the temporary storage

exemption ceased to apply. Up until that point, it could not be determined with certainty whether the units would ever return to Illinois and, thus, be subject to the Illinois use tax. Once they did return, however, and the exemption ceased to apply, their further storage constituted their first taxable use under the Act. Accordingly, to the extent that Shared Imaging paid taxes to other states on the sale or use of the units prior to their return to Illinois, they are analogous to taxes paid to other states on property prior to that property being brought into Illinois for the first time. It is our conclusion, therefore, that with respect to Units 229, 231, and 588, Shared Imaging is entitled to credit for taxes paid to other states on the units for the time preceding the units' return to Illinois following their initial temporary storage in Illinois. Shared Imaging is not, however, entitled to credit for taxes paid to other states on the units for any periods following the units' return to Illinois after their initial temporary storage, as those taxes were incurred after the Illinois use tax became applicable, and the credit applies only to taxes "already paid."

¶ 63    Because the record is not clear on what, if any, out-of-state taxes were paid on Units 229, 231, and 588 for the periods preceding their return to Illinois after their initial temporary storage in Illinois, we conclude there is a genuine issue of material fact on this issue that must be determined by the trier of fact.

¶ 64    As for Units 52, 55, 579, 585, and 591, as explained above, the expanded temporary storage exemption never applied because Shared Imaging failed to obtain the required permit prior to purchasing the units. Thus, the Illinois use tax became immediately applicable upon the purchase of those units, and at that time, no out-of-state taxes had already been paid.

Accordingly, Shared Imaging is not entitled to a credit for any out-of-state taxes paid on Units 52, 55, 579, 585, 591.[4]

¶ 65        Finally, with respect to Unit 587, we find that there is a genuine issue of material fact regarding the first use of Unit 587 that precludes us from making a determination as to whether Shared Imaging is entitled to a credit for out-of-state taxes paid on the unit. More specifically, the Goetz's affidavit states that Unit 587 was purchased in October 2008 in Waukesha, Wisconsin. According to the affidavit, Unit 587 was then leased to facilities in Tennessee, Florida, Alabama, and Georgia. Some of the leases submitted as exhibits in support of this contention, however, predate Shared Imaging's claimed purchase of Unit 587 in 2008, one of the earliest of which is a 2004 lease with an Illinois hospital. Neither Shared Imaging nor the documents in the record offer an explanation for this discrepancy. Because of this, we are unable to say as a matter of law that Unit 587 was only brought into Illinois after Shared Imaging had used it outside of Illinois and had paid out-of-state taxes on it.

¶ 66                                    Depreciation

¶ 67        In addition to claiming that it is entitled to a credit for out-of-state taxes paid on the units, Shared Imaging contends that it is entitled to a deduction to the tax base for depreciation on the units. The Act provides that "[i]f the property that is purchased at retail from a retailer is acquired outside Illinois and used outside Illinois before being brought to Illinois for use here and is taxable under this Act, the 'selling price' on which the tax is computed shall be reduced by

---

[4]The Department contends that Shared Imaging is not entitled to a credit for out-of-state taxes paid on these units for the additional reason that they were acquired in Illinois and the credit provision applies only to property acquired outside Illinois. While we do not disagree with the Department that the language of the credit provision does, in fact, reference only property acquired outside Illinois, we note that the Department's own regulations suggest that the credit can, in some instances, be applied in situations where the expanded temporary storage exemption is claimed and, thus, where the units were acquired in Illinois (a requirement of the expanded temporary storage exemption). See 86 Ill. Adm. Code 150.310(a)(6)(F), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008) (stating that where the expanded temporary storage exemption is claimed but the property is later returned to Illinois for use, it is subject to the use tax but is also entitled to a credit for taxes paid out of state).

an amount that represents a reasonable allowance for depreciation for the period of prior out-of-state use." 35 ILCS 105/3-10 (West 2008).

¶ 68    As to Units 229, 231, and 588, we conclude that Shared Imaging is entitled to a depreciation deduction on the selling price of those units. The Department argues that because storage is use under the Act, Shared Imaging used the units in Illinois prior to using them outside of Illinois, making depreciation inapplicable. The Department's regulations, however, indicate that the initial temporary storage of property before use outside of Illinois is not considered in assessing the applicability of depreciation, where the property was originally believed to be subject to the temporary storage exemption but is then later determined not to be due to the property's return to Illinois:

"In the event that tangible personal property for which the expanded temporary storage exemption has been claimed is temporarily stored in Illinois and transported outside this State for use or consumption, but subsequently returned to Illinois and used here, the purchaser shall pay the tax that would have been due, in the same form that the retailer would have paid the tax ***, at the rate applicable at the location of the retailer from which the tangible personal property was purchased. *** Depreciation will be allowed as provided in Section 150.105(a). Also, credit shall be given for tax paid in another state in respect to the sale, purchase or use of the property, to the extent of the amount of the tax properly due and paid in the other state, as provided in subsection (a)(3)." 86 Ill. Adm. Code 150.310(a)(6)(F), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008).

¶ 69    We recognize that this regulation speaks in terms of the expanded temporary storage exemption and not the temporary storage exemption. We cannot conceive, however, of any reason why a taxpayer who defeats the application of the expanded temporary exemption by

returning its property to Illinois should be entitled to a depreciation deduction, but a taxpayer who defeats the application of the temporary storage exemption in the same manner should not. Rather, we believe that this regulation illustrates that although storage might generally be included in the definition of use, the initial temporary storage of property prior to out-of-state use of the property is not counted as the first use of the property for purposes of determining whether the depreciation deduction applies. Based on this, we conclude that there is no genuine issue of material fact that Units 229, 231, and 588, aside from their initial temporary storage in Illinois, were first used outside of Illinois. It was only when the units were subsequently returned to Illinois for further storage that they were considered to have been brought into Illinois for use here. Accordingly, Shared Imaging is entitled to a deduction on the selling price of Units 229, 231, and 588 for depreciation that occurred during the period prior to the units' return to Illinois following their initial temporary storage in Illinois.

¶ 70        According to Department regulations, depreciation under these circumstances is to be calculated by use of the straight line method of depreciation. 86 Ill. Adm. Code 150.110(c) (1969). Because the parties have not offered any evidence or argument on the proper calculation of depreciation, we find that there is a genuine issue of material fact on this matter and leave it to the trier of fact to make the determination of the appropriate amount of the depreciation deduction.

¶ 71        On Unit 587, the same genuine issue of material fact that precluded us from determining whether Shared Imaging was entitled to a credit for out-of-state taxes paid on the unit also precludes us from determining whether Shared Imaging is entitled to a depreciation deduction on the unit. In particular, due to the conflicting evidence, we are unable to determine, as a matter of

law, whether Unit 587 was used outside of Illinois before being brought here. Accordingly, neither party is entitled to summary judgment on this issue.

¶ 72    Finally, with respect to Units 52, 55, 579, 585, and 591, we conclude that Shared Imaging is not entitled to depreciation deductions on the selling prices of these units. As discussed above, despite the fact that the language of the Act provides depreciation deductions only for property purchased outside of Illinois, the Department's regulations indicate that where property is initially claimed to be subject to the expanded temporary storage exemption but then is subsequently returned to and used in Illinois, not only is it to be taxed under the Act, but the taxpayer is also entitled to a depreciation deduction on the selling price of the property for the period it was used outside of Illinois prior to its return. 86 Ill. Adm. Code 150.310(a)(6)(F), amended at 32 Ill. Reg. 17554 (eff. Oct. 24, 2008). Here, however, Units 52, 55, 579, 585, and 591, could never be claimed as subject to the expanded temporary storage exemption, because they were purchased without the required permit. Accordingly, Shared Imaging is not entitled to a depreciation deduction on these units.

¶ 73                    Late Filing and Payment Penalties

¶ 74    Finally, Shared Imaging argues that all late filing and late payment penalties assessed against it by the Department should be abated because it had reasonable cause not to pay the use taxes on the various units. We agree in part.

¶ 75    Pursuant to section 3-8 of the Uniform Penalty and Interest Act (35 ILCS 735/3-8 (West 2008)), penalties for the failure to file or pay taxes on or before their due date will not apply if the failure was due to "reasonable cause." Under the Department's regulations, the determination of whether the taxpayer acted with reasonable cause is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances. The most important factor to consider is

whether the taxpayer "made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion." 86 Ill. Adm. Code 700.400(b) (2001). Where a taxpayer exercises ordinary business care and prudence in determining his tax liability and to file and pay that liability, he will be considered to have made a good faith effort. "A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education." 86 Ill. Adm. Code 700.400(c) (2001).

¶ 76    With respect to Units 229, 231, and 588, we conclude that a taxpayer exercising ordinary business care and prudence could have concluded that the temporary storage exemption applied. Even after the return of Units 229, 231, and 588 to Illinois, we do not think it unreasonable for Shared Imaging to conclude that the temporary storage exemption continued to apply, so long as it stored the units in Illinois only for short periods of time between out-of-state leases and did not lease the units in Illinois. Although we ultimately concluded that the temporary storage exemption did not, in fact, continue to apply following the units' return to Illinois, we can understand why Shared Imaging, in the absence of guiding case law, could have thought otherwise. After all, even though the Act defines use broadly enough to encompass storage, one typically understands use to involve some sort of active implementation or manipulation of the property. Accordingly, the late filing and payment penalties on Units 229, 231, and 588 should be abated.

¶ 77    As for Unit 587, Shared Imaging admits that it was leased in Illinois and makes no argument that it was subject to any exemption from the use tax. Accordingly, we see no reasonable cause for Shared Imaging's failure to file and pay the Illinois use tax on Unit 587; the penalties assessed on that unit were therefore appropriate.

¶ 78    Finally, as to Units 52, 55, 579, 585, and 591, we do not believe that Shared Imaging had reasonable cause for its failure to file for and pay the Illinois use tax on these units, because it should have been clear to Shared Imaging from the language of the Act and the Department's regulations that an expanded temporary storage permit was required to be issued before the expanded temporary storage exemption would apply. We have yet to see any explanation for Shared Imaging's failure to secure such a permit until years after the purchases of these units. Accordingly, we conclude that the assessment of late filing and payment penalties against Shared Imaging on Units 52, 55, 579, 585, and 591 was appropriate.

¶ 79    To summarize our holdings, the trial court's grant of summary judgment in favor of the Department with respect to Units 52, 55, 579, 585, and 591 is affirmed. The trial court's grant of summary judgment in favor of the Department with respect to Unit 587 is affirmed on the trial court's finding that Unit 587 is not exempt from the use tax and that the failure to timely pay the use taxes subjects Shared Imaging to late filing and late payment penalties; the trial court's judgment on Unit 587 is reversed, however, on the issues of credit for taxes paid to other states and the depreciation deduction because there exist genuine issues of material fact in these respects, which need to be determined by a trier of fact. On Units 553 and 582, the trial court's grant of summary judgment in favor of Shared Imaging[RoD1] is reversed in all respects at issue on appeal because the Department concedes that the use of these units should never have been taxed in the first place. Finally, with respect to Units 229, 231, and 588, the trial court's judgment on the issue of whether these units are exempted from the use tax is affirmed. Shared Imaging is entitled, however, on each of these units, to a credit for taxes paid to other states for the periods before the units were returned to Illinois following their initial post-purchase storage in Illinois. In addition, Shared Imaging is entitled to a deduction on the selling price of these

units for depreciation that occurred prior to their return to Illinois. There exist genuine issues of material fact as to the amount of the credit and depreciation deductions on each of these units, which must be determined by the trier of fact. Finally, the late filing and late payment penalties assessed with respect to Units 229, 231, and 588 should be abated.

¶ 80                                              CONCLUSION

¶ 81        For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

¶ 82        Affirmed in part, reversed in part, and remanded.