# Illinois Official Reports

## Appellate Court

*Horsehead Corp. v. Department of Revenue*, 2018 IL App (1st) 172802

| | |
|---|---|
| Appellate Court Caption | HORSEHEAD CORPORATION, Petitioner, v. THE DEPARTMENT OF REVENUE and THE ILLINOIS INDEPENDENT TAX TRIBUNAL, Respondents. |
| District & No. | First District, First Division<br>Docket No. 1-17-2802 |
| Filed | September 24, 2018 |
| Decision Under Review | Petition for review of order of Illinois Independent Tax Tribunal, No. 14-TT-227. |
| Judgment | Tax tribunal decision affirmed. |
| Counsel on Appeal | Kirkland & Ellis LLP, of Chicago (JoAnne Mulder Nagjee and Steven M. Cantor, of counsel), and Difede Ramsdell Bender PLLC, of Washington, D.C. (Joseph E. Bender, of counsel), for petitioner.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for respondents. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Walker concurred in the judgment and opinion. |

¶ 1 Respondent Illinois Department of Revenue (IDOR) issued petitioner Horsehead Corporation[1] two notices of tax liability for Horsehead's failure to pay use taxes on its purchases of metallurgical coke between January 2007 and June 2011. Horsehead filed a petition for review with the Illinois Independent Tax Tribunal (tax tribunal), which affirmed the notices of tax liability as well as the imposition of the use tax, interest, late filing penalties, and late payment penalties totaling approximately $1,521,041. Horsehead timely filed a petition for review in this court. For the following reasons, we affirm the tax tribunal's final decision.

¶ 2                              BACKGROUND

¶ 3 Illinois imposes a use tax "upon the privilege of using in this State tangible personal property purchased at retail from a retailer." 35 ILCS 105/3 (West 2016). Relevant to the issues in this appeal, section 3-5(18) of the Use Tax Act contains an exemption from the use tax for the following manufacturing and assembling machinery and equipment:

> "Manufacturing and assembling machinery and equipment used primarily in the process of manufacturing or assembling tangible personal property for wholesale or retail sale or lease, whether that sale or lease is made directly by the manufacturer or by some other person, whether the materials used in the process are owned by the manufacturer or some other person, or whether that sale or lease is made apart from or as an incident to the seller's engaging in the service occupation of producing machines, tools, dies, jigs, patterns, gauges, or other similar items of no commercial value on special order for a particular purchaser." *Id.* § 3-5(18).

¶ 4 Section 3-50 of the Use Tax Act contains a definition of "equipment" that includes certain "chemicals and chemicals acting as catalysts":

> "§ 3-50. Manufacturing and assembly exemption. The manufacturing and assembling machinery and equipment exemption includes machinery and equipment that replaces machinery and equipment in an existing manufacturing facility as well as machinery and equipment that are for use in an expanded or new manufacturing facility. *** For the purposes of this exemption, terms have the following meanings:
>
>                                  * * *
>
> (4) 'Equipment' includes an independent device or tool separate from machinery but essential to an integrated manufacturing or assembly process ***. *** *Equipment includes chemicals or chemicals acting as catalysts but only if the chemicals or chemicals acting as catalysts effect a direct and immediate change upon a product being manufactured or assembled for wholesale or retail sale or lease.*" (Emphasis added.) *Id.* § 3-50(4).

¶ 5 Horsehead recycles electric arc furnace dust (EAF Dust) generated by steel producers. EAF Dust contains zinc oxide, iron oxide, and other impurities that may include chlorides, lead, and cadmium. Horsehead reclaims zinc and metallic oxides from EAF Dust through a

---

[1]Horsehead Corporation is now known as American Zinc Recycling Corporation. We will, however, refer to petitioner as "Horsehead."

recycling process that strips impurities from the zinc oxide to extract pure zinc, which is collected in powder form and sold directly to third parties. The remaining EAF Dust is heated to a higher temperature to separate impurities from the iron oxide to produce iron-rich material, which is sold to third parties for their own manufacturing processes.

¶ 6    Horsehead operates a recycling facility in Calumet City, Illinois. It employs a "Waelzing process," using a rotary Waelz kiln—a long, rotating, cylindrical oven situated at a slight angle—to "reduce" and recover the zinc as crude zinc oxide from EAF Dust. Horsehead purchases metallurgical coke—a solid material consisting almost entirely of carbon—for use in the Waelzing process. Horsehead combines EAF Dust with metallurgical coke "breeze" (*i.e.*, metallurgical coke in fine dust form) and water to create pellets. The pellets are then fed into one end of the kiln, and oxygen from the outside air is drawn into the kiln from the opposite side. The air inside the kiln is heated by external gas burners to between 600 and 700 degrees centigrade to dry the pellets. At this temperature, a chemical reaction starts to occur.

¶ 7    When the pellets reach the desired temperature, the metallurgical coke reacts with the carbon dioxide, creating carbon monoxide.[2] As the carbon monoxide seeps into the heated pellets on the kiln bed, the carbon monoxide acts as a reducing agent to strip away oxygen from the zinc oxide and iron oxide in the EAF Dust, resulting in metallic zinc vapor and metallic iron. The process results in additional carbon dioxide, which then reacts with the heated pellets to produce additional carbon monoxide, which then seeps into the heated pellets on the kiln bed, stripping away more oxygen from the zinc oxide and iron oxide in the EAF Dust, resulting in a continuous, self-sustaining cycle of reactions. The metallic zinc vapor rises from the kiln bed and reacts with oxygen inside the kiln, producing fine particles of crude zinc oxide. The metallic iron also reacts with the oxygen inside the kiln, producing iron oxide rich material. These reoxidation processes generate heat within the kiln, making the Waelzing process self-sustaining.

¶ 8    After the Waelzing process is completed, Horsehead either sells the crude zinc oxide directly to third parties (as "Waelz oxide") or sends it to another Horsehead facility for further refining, where it is then sold to third parties. The iron oxide rich material is also sold to third parties. Virtually all of the metallurgical coke is consumed during the Waelzing process.

¶ 9    On October 3, 2014, IDOR issued Horsehead two "Notices of Tax Liability" for the period of January 1, 2007, through June 30, 2011.[3] IDOR's notices informed Horsehead that it was liable for approximately $1,521,041 in use taxes, interest, late payment penalties, and late filing penalties under the Use Tax Act (35 ILCS 105/1 *et seq.* (West 2012)) for Horsehead's out-of-state purchases of metallurgical coke used in the Waelzing processes, for which it had not paid any use tax. Horsehead filed a petition for hearing with the tax tribunal, contending that the purchases of metallurgical coke were exempt from the use tax under section 3-50(4) of the Use Tax Act because the metallurgical coke, as part of the Waelzing processes, met the definition of a chemical or a chemical acting as a catalyst to effect a direct and immediate change upon the zinc and iron in the EAF Dust. IDOR answered the petition, and the parties

---

[2]Expressed as a chemical formula, $C + CO_2 = 2CO$. In other words, the reaction between carbon and the carbon dioxide in an oxygen-poor environment such as the kiln produces carbon monoxide.

[3]The first notice covered the period of January 1, 2007, through June 30, 2009, and the second notice covered the period of July 1, 2009, through June 30, 2011.

engaged in discovery. The tax tribunal conducted a hearing, where it heard testimony from numerous witnesses, and considered posthearing briefs from the parties.

¶ 10    The tax tribunal considered the plain meaning of the terms "direct" and "immediate," as used in section 3-50(4) of the Use Tax Act, and found those terms to be clear and unambiguous. The tax tribunal also considered IDOR's administrative regulations in section 130.330(c)(6) of Title 86 of the Illinois Administrative Code (Title 86) (86 Ill. Adm. Code 130.330(c)(6) (2016)), which provides two examples of reactions that are direct and immediate. The tax tribunal's written decision concluded that the carbon monoxide acts as the reducing agent and causes a direct and immediate change on the zinc oxide and iron oxide, the product being sold by Horsehead. The tax tribunal concluded that in the Waelzing process, metallurgical coke does not directly and immediately cause a change to the zinc and iron in the EAF Dust because "[s]imply placing [metallurgical] coke next to zinc oxide or zinc does not create any chemical reaction whatsoever, a point conceded by Horsehead's own witnesses." The tax tribunal found that Horsehead was attempting to condense all of the separate chemical reactions in the Waelzing process into a continuous and single chemical reaction and that Horsehead's position "renders the language 'direct and immediate' void." The tax tribunal observed that it was the carbon monoxide—not the carbon in the metallurgical coke alone—that reacts with the zinc oxide and iron oxide. The tax tribunal further observed that none of Horsehead's witnesses were asked to define the term "catalyst" or testified that the metallurgical coke acted as a catalyst. Therefore, the tax tribunal concluded that Horsehead's out-of-state purchases of metallurgical coke did not qualify for the exemption set forth in section 3-50(4) of the Use Tax Act and that Horsehead was liable for the tax.

¶ 11    Before the tax tribunal, Horsehead argued that, if it were liable for the use tax, it should not have to pay the late filing and late payment penalties. Horsehead did not challenge the amount of the penalties, but instead argued that the penalties should be abated under section 700.400 of Title 86 (86 Ill. Adm. Code 700.400(b), (c) (2001)). It contended that section 3-50(4) of the Use Tax Act lacks a specific definition of the term "direct and immediate change" and that it had a history of complying with its other state tax obligations. The tax tribunal agreed that Horsehead had shown compliance with its other tax obligations but observed that Horsehead failed to present any evidence of good faith with respect to the position it took toward the chemical exemption. Thus, there was no evidence as to "what or who [Horsehead] relied upon in choosing to claim its [metallurgical] coke purchases as catalysts when it chose not to pay the use tax in question, other than [Horsehead's] claim that the term 'direct and immediate' is undefined, leaving the chemical exemption statute unclear." The tax tribunal upheld IDOR's imposition of late filing penalties and late payment penalties under section 12 of the Use Tax Act (35 ILCS 105/12 (West 2016)), which incorporates portions of the Uniform Penalty and Interest Act (35 ILCS 735/3-1 *et seq.* (West 2016)).

¶ 12    Horsehead timely filed a petition for review in this court from the tax tribunal's final decision. 35 ILCS 1010/1-75 (West 2016); 735 ILCS 5/3-113 (West 2016); Ill. S. Ct. R. 335 (eff. July 1, 2017).

¶ 13                                    ANALYSIS

¶ 14    On appeal, Horsehead raises the same two principal arguments that it advanced before the tax tribunal. First, it argues that its purchases of metallurgical coke were exempt under section 3-50(4) of the Use Tax Act because the metallurgical coke effects a direct and immediate

change on the zinc oxide and iron oxide sold by Horsehead and that the tax tribunal's decision elevates form over substance. Second, Horsehead argues that, even if it is liable for the use tax, it had reasonable cause to take the position that these purchases were exempt and the tax tribunal's decision to uphold the late payment and late filing penalties was against the manifest weight of the evidence.

¶ 15    The parties disagree on the appropriate standard of review for Horsehead's challenge to the tax tribunal's order finding that the chemical exemption does not apply. Horsehead contends that there are no factual challenges at issue and therefore the tax tribunal's determination of whether the exemption applies is a question of law reviewed *de novo*. See *Zenith Electronics Corp. v. Department of Revenue*, 293 Ill. App. 3d 651, 654 (1997) ("Where no factual dispute exists, and the question raised on review is purely legal, such as statutory construction, our review is *de novo*."). IDOR argues that the clearly erroneous standard applies because the historical facts are not in dispute, and the question is whether those facts meet a statutory definition. See *Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011). We agree with IDOR that the clearly erroneous standard applies, as this case involves a mixed question of law and fact. See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391 (2001) (stating that a mixed question of law and fact is one involving an examination of the legal effect of a given set of facts). An administrative agency's decision "will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 16    Horsehead insists, however, that the tax tribunal's decision should be afforded no deference at all because it "is not charged with either enforcing the Use Tax Act or promulgating the regulations thereunder, but rather is an independent State agency charged with resolving disputes between taxpayers and [IDOR]." Horsehead relies on *Salt Creek Rural Park District v. Department of Revenue*, 334 Ill. App. 3d 67, 70-71 (2002), for the proposition that the *de novo* standard applies where an administrative agency's decision does not implicate that agency's unique expertise. We disagree with Horsehead's conclusion. In enacting the Illinois Independent Tax Tribunal Act of 2012, the legislature declared the purpose of the tax tribunal:

"To increase public confidence in the fairness of the State tax system, the State shall provide an independent administrative tribunal *with tax expertise* to resolve tax disputes between the Department of Revenue and taxpayers prior to requiring the taxpayer to pay the amounts in issue. By establishing an independent tax tribunal, this Act provides taxpayers with a means of resolving controversies that ensures both the appearance and the reality of due process and fundamental fairness." (Emphasis added.) 35 ILCS 1010/1-5(a) (West 2016).

The statutory language reflects an express legislative mandate that the tax tribunal possess and employ tax expertise in resolving tax disputes. Horsehead offers no argument that the tax tribunal in this case did not possess the requisite tax expertise to interpret the Use Tax Act or that it failed to meaningfully employ that expertise when determining whether Horsehead's out-of-state metallurgical coke purchases qualify for an exemption under Use Tax Act. That stated, our supreme court "has frequently acknowledged the wisdom of judicial deference to an agency's experience and expertise." *AFM Messenger*, 198 Ill. 2d at 394-95 (collecting cases). We therefore reject Horsehead's contention that the tax tribunal lacks expertise in interpreting

the Use Tax Act such that we must apply a *de novo* standard of review. This does not mean, however, that we must blindly defer to the tax tribunal's decision. *Id.* at 395.

¶ 17 We now turn to Horsehead's arguments and the tax tribunal's decision. Horsehead's first argument on appeal is that its purchases of metallurgical coke were exempt under section 3-50(4) of the Use Tax Act because, in its recycling process, metallurgical coke effects a direct and immediate change on the zinc oxide and iron oxide. Horsehead attempts to frame the issue on appeal as "whether the [metallurgical] coke is somehow ineligible for the chemical exemption because in order to effect [a] direct and immediate change[ ], the [metallurgical] coke must first be heated to its reactive temperature." We observe, however, that the tax tribunal did not find the process of heating metallurgical coke to be a determinative factor in assessing whether the chemical exemption applied but, instead, considered whether it was the metallurgical coke or the carbon monoxide that effected a direct and immediate change on the zinc oxide and iron oxide.

¶ 18 Horsehead contends that the phrase "direct and immediate" as used in section 3-50(4) of the Use Tax Act must be afforded its "plain, everyday meaning" but that the tax tribunal gave the term an "overly literal interpretation [that] precludes both activating forces (such as heat) and the concurrent involvement of other chemicals or agents (such as oxygen)." In other words, Horsehead argues that the plain and ordinary meaning of express statutory terms should be given "common-sense" meanings rather than overly literal meanings to avoid excluding too many chemicals from the exemption. Horsehead does not, however, advance any argument on appeal as to what, in the context of the Use Tax Act, the phrase "direct and immediate" means.

¶ 19 It is a fundamental rule of statutory interpretation to determine and give effect to the intent of the legislature, and the best indicator of that intent is the statutory language, which is to be given its plain and ordinary meaning. *Shared Imaging, LLC v. Hamer*, 2017 IL App (1st) 152817, ¶ 25. Horsehead did not argue before the tax tribunal, and does not argue on appeal, that the term "direct and immediate" is ambiguous, nor does it quarrel with the tax tribunal's decision to consult a dictionary for the definitions of "direct" and "immediate." The tax tribunal stated that the plain and ordinary meaning of "direct" includes "[e]xtending or moving from one place to another without changing direction or stopping" and "[w]ithout intervening factors or intermediaries." English Oxford Living Dictionaries, https://en.oxforddictionaries. com/definition/direct (last visited Sept. 19, 2018) [https://perma.cc/8CEN-V8AG]; see also Black's Law Dictionary 471 (7th ed. 1999) (defining "direct" as "straight; undeviating," and "[f]ree from extraneous influence; immediate"). The tax tribunal defined "immediate" as "[o]ccurring or done at once; instant." English Oxford Living Dictionaries, https://en. oxforddictionaries.com/definition/immediate (last visited Sept. 19, 2018) [https://perma.cc/ 338T-GSYF]; see also Black's Law Dictionary 751 (7th ed. 1999) (defining "immediate" as "[o]ccurring without delay; instant" and "[h]aving a direct impact; without an intervening agency"). Taken together, a direct and immediate change on a product being manufactured for sale is one that occurs at once without any intervening factors or intermediate steps. As noted above, the chemical exemption provides, "Equipment includes chemicals or chemicals acting as catalysts but only if the chemicals or chemicals acting as catalysts effect a direct and immediate change upon a product being manufactured or assembled for wholesale or retail sale or lease." 35 ILCS 105/3-50(4) (West 2016). The plain language of the exemption, therefore, means exactly what it says: to be eligible under the chemical exemption, the metallurgical coke

must effect a change on the zinc and iron in the EAF Dust that occurs at once without an intermediate step.

¶ 20 Here, the tax tribunal concluded that the metallurgical coke did not effect a direct and immediate change on the zinc and iron in the EAF Dust. During the Waelzing processes, the metallurgical coke combines with the carbon dioxide in the kiln to create carbon monoxide. The created carbon monoxide then strips oxygen from the zinc oxide and iron oxide in the EAF Dust, resulting in metallic zinc vapor and metallic iron, which in turn reacts with oxygen, resulting in crude zinc oxide and iron oxide rich material. While the metallurgical coke is an integral part of achieving the desired chemical reactions, the metallurgical coke itself does not effect a direct and immediate change on the products being manufactured: zinc and iron. Before the tax tribunal, one of Horsehead's witnesses acknowledged that "the [metallurgical] coke or carbon [does] not react directly with either the zinc oxide or the iron oxide to reduce them to zinc and iron." As the tax tribunal observed in its final order, "the lack of a direct and immediate reaction dooms [Horsehead's] argument to the contrary."

¶ 21 Furthermore, IDOR's administrative rules provide two examples of chemicals effecting a direct and immediate change.

> "A) Example 1. A chemical acid is used to etch copper off the surface of a printed circuit board during the manufacturing process. The acid causes a direct and immediate change upon the product. The acid qualifies for the exemption.
>
> B) Example 2. An aluminum oxide catalyst is used in a catalytic cracking process to refine heavy gas oil into gasoline. In this process, large molecules of gas oil or feed are broken up into smaller molecules. After the catalyst is injected into the feed and used in the cracking process, it is drawn off and reused in subsequent manufacturing processes. The catalyst qualifies for the exemption." 86 Ill. Adm. Code 130.330(c)(6)(A), (B) (2016).

¶ 22 In the first example, the acid, without first going through any intermediate chemical changes, directly and immediately etches copper from the circuit board. In the second example, the aluminum oxide is introduced to heavy gas oil and, without going through any intermediate chemical changes, cracks the large molecules of gas oil and feeds into smaller molecules. Here, the carbon from the metallurgical coke combines with carbon dioxide to create carbon monoxide, which then strips away oxygen from the zinc oxide and iron oxide in the EAF Dust. Horsehead's use of metallurgical coke, therefore, is part of a series of intermediate steps in the Waelzing process to create the carbon monoxide gas that causes a direct and immediate change to the zinc and iron in the EAF Dust, and it bears little resemblance to the acid and aluminum oxide described in IDOR's two examples. With respect to IDOR's second example, Horsehead argues that cracking heavy gas oil through the use of aluminum oxide requires the introduction of heat, just like Horsehead's metallurgical coke being heated. But even accepting that aluminum oxide is heated during the cracking process, IDOR's second example contemplates that the heated aluminum oxide causes the cracking of heavy gas oil, as opposed to the heated aluminum oxide causing an intermediate chemical change that in turn causes the cracking. It is clear from IDOR's second example that the mere introduction of heat to a chemical would not cause that chemical to become ineligible for the exemption in section 3-50(4) of the Use Tax Act.

¶ 23 Horsehead argues that construing section 3-50(4) in a manner that does not exempt Horsehead's metallurgical coke purchases defeats the purpose of the exemption, which is "to

attract new manufacturing facilities to our State and to discourage existing ones from relocating outside Illinois." *Chicago Tribune Co. v. Johnson*, 106 Ill. 2d 63, 72 (1985). It contends that giving the term "direct and immediate effect" an overly literal interpretation "would virtually gut the chemical exemption by excluding any chemicals that must first undergo any process before reacting with the products being manufactured." That is simply not true; as long as the chemical itself, whether heated or diluted, effects the direct and immediate change on the product being manufactured or assembled for sale, it qualifies for the chemical use tax exemption. Furthermore, we are not in a position to extend the chemical exemption in a manner that would be inconsistent with the plain and ordinary meaning of the terms employed by our legislature in crafting this exemption. It is clear from the plain language of section 3-50(4) of the Use Tax Act that the legislature intended to provide a use tax exemption limited to chemicals or chemicals acting as catalysts that effect a direct and immediate change on the products being manufactured or assembled for sale or lease, and not for all chemicals or chemical catalysts used during the manufacturing process. The legislature is, of course, free to amend or revise the chemical exemption to include chemicals that are used to create other chemicals that effect direct and immediate changes on the products being manufactured. Until it does so, however, we must give the legislature's words their plain and ordinary meaning.

¶ 24    In sum, we cannot say that the tax tribunal committed clear error in determining that Horsehead's purchases of metallurgical coke for use during the Waelzing process did not qualify for an exemption under section 3-50(4) of the Use Tax Act. Therefore, we affirm the tax tribunal's order affirming IDOR's determination of use tax liability for Horsehead's out-of-state purchases of metallurgical coke.

¶ 25    Next, Horsehead argues that, should we affirm the tax tribunal's decision on Horsehead's use tax liability, the late payment penalties and late filing penalties should be abated because it satisfies the "reasonable cause" exception in section 3-8 of the Uniform Penalty and Interest Act (35 ILCS 735/3-8 (West 2016)) and section 700.400 of Title 86 (86 Ill. Adm. Code 700.400(b), (c) (2016)). It argues that the tax tribunal, in upholding the penalties, failed to account for the lack of controlling authority regarding the "unclear" chemical exemption, and instead relied on "its own novel interpretation of the statutory language."

¶ 26    The parties agree that our review of the tax tribunal's determination that Horsehead was not entitled to abatement of penalties is governed by the manifest weight of the evidence standard. It is well settled that an agency's determination of whether reasonable cause exists "will be reversed only if the agency's decision was against the manifest weight of the evidence and only if the opposite conclusion was clearly evident." *Hollinger International, Inc. v. Bower*, 363 Ill. App. 3d 313, 315 (2005). "The existence of reasonable cause justifying abatement of a tax penalty is a factual determination that is to be decided only on a case-by-case basis." *Id.* at 315-16. Horsehead argues, however, that must review *de novo* the tax tribunal's finding that the chemical exemption is clear because the tax tribunal's determination as to the clarity of the chemical exemption is entitled to no deference where the tax tribunal does not enforce the Use Tax Act or promulgate any regulations under that act. We have already rejected this argument. See *supra* ¶ 16.

¶ 27    Under the Uniform Penalty and Interest Act, a taxpayer is not subject to penalties if the "failure to file a return or pay tax at the required time was due to reasonable cause." 35 ILCS 735/3-8 (West 2016). Section 700.400 of Title 86 provides:

"(b) The determination of whether a taxpayer acted with reasonable cause shall be made on a case by case basis taking into account all pertinent facts and circumstances. The most important factor to be considered in making a determination to abate a penalty will be the extent to which the taxpayer made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion.

(c) A taxpayer will be considered to have made a good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so. A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education. Accordingly, reliance on the advice of a professional does not necessarily establish that a taxpayer exercised ordinary business care and prudence, nor does reliance on incorrect facts such as an erroneous information return." 86 Ill. Adm. Code 700.400(b), (c) (2001).

¶ 28    We conclude that the tax tribunal's decision to uphold the penalties is not against the manifest weight of the evidence. To determine whether Horsehead acted with reasonable cause, the tax tribunal considered whether Horsehead exercised ordinary business care and prudence, which is in part guided by the clarity of the law or interpretations of that law. The tax tribunal acknowledged that the term "direct and immediate change" in the chemical exemption had no statutory or regulatory definition and that there was no controlling case law as to how the chemical exemption should be interpreted. But the tax tribunal correctly found that "the terms 'direct' and 'immediate' have their simple every day meaning as used in the statute, and those meanings provide clarity to the statute, as opposed to a lack of clarity as argued by [Horsehead]." It is well settled that the best indicator of legislative intent is the language of the statute when given its plain and ordinary meaning. *Shared Imaging*, 2017 IL App (1st) 152817, ¶ 25. While it is true that there was no controlling case law on how those terms should be interpreted within the context of the chemical exemption, the plain language of the exemption is clear and unambiguous that only those chemicals that have a direct and immediate effect on the product being manufactured are exempt from the use tax. See *id.* ¶ 78 (upholding the imposition of late filing and late payment penalties where the taxpayer's obligations "should have been clear *** from the language of the [Use Tax Act] and [IDOR's] regulations"). As we explained above, Horsehead does not argue that the statutory language was ambiguous and does not challenge the tax tribunal's definitions of the terms "direct" and "immediate." The language of the chemical exemption was clear, and Horsehead cannot rely on its own erroneous interpretation of the statute to argue that it exercised ordinary business care and prudence in failing to file and pay the use tax.

¶ 29    Also relevant to the inquiry as to whether Horsehead made a good-faith effort to determine its tax liability is its experience and knowledge. Horsehead does not make any express argument on this point but does insist that its prior history of tax compliance is evidence of a good-faith effort. The tax tribunal considered this argument and gave it "some, but not a great deal of, weight." The tax tribunal noted that Horsehead presented no evidence "to support its claim of good faith in taking the position it did on the chemical exemption issue, although it had the opportunity to do so." Horsehead presented no evidence at the hearing as to any previous audits by IDOR where its out-of-state purchases of metallurgical coke were identified or discussed or that the chemical exemption had ever been raised in a prior audit. Nor was there any evidence that Horsehead sought any professional guidance on its potential use tax liability,

which, while not determinative, may have persuaded the tax tribunal of Horsehead's good-faith efforts to comply with the Use Tax Act. In sum, Horsehead's argument that it made a good-faith effort to comply with its use tax obligations because the law surrounding the chemical exemption was unclear, that there was no controlling authority available, and that it had paid all of its other taxes is unavailing. Had Horsehead reasonably believed it was exempt from paying a use tax on its out-of-state purchases of metallurgical coke, it would have presented testimony evidencing a business decision that acknowledged a good-faith effort to determine its appropriate tax liability and the reasons why it failed to pay. The absence of any testimony at the hearing in this vein, coupled with its own witness conceding that "the [metallurgical] coke or carbon [does] not react directly with either the zinc oxide or the iron oxide to reduce them to zinc and iron," supports the tax tribunal's finding that "reasonable cause" to abate statutory penalties did not exist. Horsehead's unilateral interpretation of the chemical exemption did not comport with the plain language of the exemption, and it presented no evidence of any other reliance to support its decision to not pay the use tax. Based on the record before the tax tribunal and this court, we cannot say that the tax tribunal's decision to uphold the imposition of the late payment penalties and late filing penalties was against the manifest weight of the evidence.

¶ 30                                                  CONCLUSION

¶ 31        For the foregoing reasons, the final order of the tax tribunal is affirmed.

¶ 32        Tax tribunal decision affirmed.