# Illinois Official Reports

## Supreme Court

---

### *Horsehead Corp. v. Department of Revenue*, 2019 IL 124155

---

| | |
|---|---|
| Caption in Supreme Court: | HORSEHEAD CORPORATION, Appellant, v. THE DEPARTMENT OF REVENUE *et al.* (The Department of Revenue, Appellee). |
| Docket No. | 124155 |
| Filed | November 21, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on review of order of the Illinois Independent Tax Tribunal. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Tribunal decision affirmed in part and reversed in part. |
| Counsel on Appeal | JoAnne Mulder Nagjee and Steven M. Cantor, of Kirkland & Ellis LLP, of Chicago, and Joseph E. Bender, of Difede Ramsdell Bender PLLC, of Washington, D.C., for appellant. |
| | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Bridget DiBattista, Assistant Attorney General, of Chicago, of counsel), for appellee Department of Revenue. |
| | Michael J. Wynne and Douglas A. Wick, of Jones Day, of Chicago, for *amicus curiae* Taxpayers' Federation of Illinois. |

Justices     JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Burke and Justices Thomas, Kilbride, Garman, Karmeier, and Neville concurred in the judgment and opinion.

## OPINION

¶ 1  Petitioner, Horsehead Corporation (Horsehead), filed a petition for review with the Illinois Independent Tax Tribunal of notices of tax liability issued by respondent the Department of Revenue (Department). The notices were issued due to Horsehead's failure to pay Illinois use tax (35 ILCS 105/1 *et seq.* (West 2012)) on its out-of-state purchases of metallurgical coke between January 2007 and June 2011. The tax tribunal affirmed the notices of tax liability and the imposition of use tax, interest, late filing penalties, and late payment penalties. The appellate court affirmed the tax tribunal's decision. 2018 IL App (1st) 172802, ¶ 31. For the reasons that follow, we affirm in part and reverse in part the judgment of the appellate court.

¶ 2              BACKGROUND

¶ 3  Horsehead is a Delaware corporation with its primary place of business in Pittsburgh, Pennsylvania. It has a manufacturing facility located in Calumet City, Illinois, where it operates a zinc refining facility.

¶ 4  On October 3, 2014, the Department issued Horsehead two notices of tax liability for the period of January 1, 2007, through June 30, 2011, in an amount totalling $1,521,041. This amount constituted use tax, interest, late payment penalties, and late filing penalties related to its out-of-state purchases of metallurgical coke, a solid material consisting almost entirely of carbon, for which it had not paid any Illinois use tax.[1] Use tax is imposed in Illinois on tangible personal property purchased at retail from outside the state. 35 ILCS 105/3 (West 2012).

¶ 5  On December 1, 2014, Horsehead filed a petition for hearing with the Illinois Independent Tax Tribunal. The company argued that it was exempt from paying use tax on the coke under section 3-5(18) of the Use Tax Act (Act) (*id.* § 3-5(18)) for machinery and equipment used primarily in the manufacturing of tangible personal property.

¶ 6  Specifically, Horsehead relied upon the "chemical exemption" found in section 3-50(4) of the Act, which contains, in pertinent part, a definition of "equipment" that includes certain chemicals that are exempt from paying use tax:

> "(4) 'Equipment' includes an independent device or tool separate from machinery but essential to an integrated manufacturing or assembly process ***. *Equipment includes chemicals* or chemicals acting as catalysts *but only if the chemicals* or chemicals acting as catalysts *effect a direct and immediate change* upon a product being manufactured or assembled for wholesale or retail sale or lease." (Emphases added.) *Id.* § 3-50(4).

---

[1] The Department assessed $1,210,511 for the unpaid use tax and interest. The remaining assessment of $310,530 constituted late payment and late filing penalties.

Horsehead claimed that it was entitled to this tax exemption because the chemical coke effected "a direct and immediate change" on the zinc and iron products manufactured by it.[2]

¶ 7 The parties stipulated to the following facts concerning Horsehead's use of coke in its manufacturing process.

¶ 8 At its Calumet City facility, Horsehead is primarily in the business of recovering zinc from electric arc furnace dust (EAF dust) generated by steel mill producers. Under a process referred to as the "Waelzing process," based on the Waelz kiln in which it takes place, rotary kilns are used to reduce and recover the zinc as crude oxide. As part of this overall manufacturing process, Horsehead purchases metallurgical coke outside of Illinois.

¶ 9 Prior to the start of the Waelzing process, the EAF dust is converted into pellet form. The coke can either be mixed into the EAF dust pellets or can be added separately. The kiln is preheated to initiate the process. The furnace dust and coke mixture is fed into the rotary kiln. Thereafter, a natural gas burner is used as necessary to adjust the process temperature. The process requires the heating of the coke in order to release the carbon in the coke.

¶ 10 When the coke is burned in the oxygen-poor atmosphere of the kiln, some of the carbon forms carbon monoxide. Because the bed in a Waelz kiln is very hot—between 1600 and 2400°F—and contains very little oxygen (less than 0.01%), the carbon in the coke is converted almost entirely to carbon monoxide. The carbon monoxide then reacts with the zinc oxide in the EAF dust. In this chemical reduction reaction, the carbon monoxide produced from the coke acts on the zinc oxide in the EAF dust. The zinc also reacts with oxygen in the air space in the kiln. Secondary reactions between carbon monoxide and cadmium, lead, copper, and iron in the EAF dust also occur. The zinc oxide is ultimately gathered and cooled and moved to the next step of refining for ultimate sale. Separately, the iron and copper remains are collected and also sold by the company.

¶ 11 At the final hearing before the tax tribunal, Horsehead called three witnesses to explain the Waelzing process. Dr. Mark Schlesinger, professor of metallurgical engineering at Missouri University of Science and Technology, testified as an expert witness. John Pusateri, the director of technology at Horsehead, and Reges Zagrocki, an employee who provides technical support to Horsehead's recycling groups, also testified.

¶ 12 These witnesses established that the overall Waelzing process takes approximately 2½ hours. Virtually all of the coke is consumed in the process, which includes four zones. First, the coke and the EAF dust are pelletized and mixed together at a ratio of approximately 25% coke to dust. Water is added to the mixture to produce pellets that are one-quarter of an inch or less in diameter. The pellets are fed into the kiln. During the second zone, several chemical reactions occur. As the coke burns, carbon from the coke reacts with carbon monoxide. Carbon dioxide is also produced and reacts with the burning carbon to create additional carbon monoxide, through repeated cycles in this zone. In the third zone, iron reacts with the oxygen in the air to reform iron oxide, which generates heat. In the fourth and final zone, the zinc oxidizes. This oxidation leaves small particles of zinc oxide that are gathered and later refined. The iron-rich material created during the process is also collected and similarly sold.

---

[2]Horsehead acknowledged at oral argument that the coke used in its manufacturing process does not act as a catalyst.

¶ 13    All three witnesses testified that carbon monoxide, not carbon from the coke, is the agent that reduces EAF dust to zinc oxide and iron oxide. Dr. Schlesinger acknowledged that heated carbon alone does not create carbon monoxide and explained that carbon reacts with carbon dioxide to produce carbon monoxide. He testified that, if he were to take solid iron oxide and place it next to solid carbon, "nothing would happen." He further testified that "what actually happens in this process is that as this reaction generates [carbon dioxide], it reacts with the carbon to produce two carbon monoxides. The carbon monoxide is a gas and can diffuse into the solid feed pellets. And when that happens, the carbon monoxide actually reduces the iron oxide to metallic iron and reduce[s] the zinc oxide to zinc vapor."

¶ 14    After taking the matter under advisement, the tax tribunal issued a written decision affirming the two notices of tax liability. The tax tribunal concluded that the coke did not qualify for the claimed exemption because, in the Waelzing process, the coke does not effect a direct and immediate change upon the product being manufactured. The tax tribunal found that the coke did not react with zinc or zinc oxide directly and immediately. As conceded by Horsehead's own witness, simply placing coke next to zinc oxide does not create any chemical reaction whatsoever. The coke does not react directly with either the zinc oxide or the iron oxide to reduce them to zinc and iron.

¶ 15    In rejecting Horsehead's claim that it was entitled to the exemption, the tax tribunal found that Horsehead was attempting to collapse and conflate all steps within the Waelzing process into one continuous and singular chemical reaction. It found that such a simplistic view would "turn the chemical exemption statute on its head." The tax tribunal concluded that it would render the language "direct and immediate" meaningless and would allow any chemical that is used in the manufacturing process for any reason, at any time, to qualify for the exemption.

¶ 16    Additionally, the tax tribunal upheld the late payment and late filing penalties imposed by the Department under section 12 of the Act (*id.* § 12), which incorporates portions of the Uniform Penalty and Interest Act (35 ILCS 735/3-1 *et seq.* (West 2012)). The tax tribunal acknowledged that the Department's audit file had been admitted into evidence, and it noted Horsehead's history of tax compliance. It found that Horsehead had shown good conduct in complying with state tax laws and that such conduct carried some weight in supporting the company's claim of good faith when it failed to pay use tax on the coke.

¶ 17    The tax tribunal declined to abate the penalties, however, because Horsehead did not present any witnesses or evidence to support its claim of good faith in taking the position that it qualified for the chemical exemption. The tax tribunal found that the record was silent as to what Horsehead relied upon to conclude that it was entitled to the exemption other than its claim that the statute was unclear because the term "direct and immediate" is undefined.

¶ 18    Horsehead filed a petition for review of the tax tribunal's decision in the appellate court, pursuant to section 1-75 of the Illinois Independent Tax Tribunal Act of 2012 (Tax Tribunal Act) (35 ILCS 1010/1-75 (West 2012)).

¶ 19    The appellate court affirmed the tax tribunal's final order. Reviewing the tribunal's order for whether it was clearly erroneous, the court found that the tribunal's ultimate conclusion—that the coke did not effect a direct and immediate change on the zinc and iron in the EAF dust—was supported by the evidence presented at the hearing. The appellate court also held that the tribunal's finding that Horsehead was not entitled to abatement of penalties was not against the manifest weight of the evidence. 2018 IL App (1st) 172802, ¶ 28.

¶ 20 We granted Horsehead's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)) and permitted the Taxpayers' Federation of Illinois to file an *amicus curiae* brief in support of Horsehead's position (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 21 ANALYSIS

¶ 22 I. Standard of Review

¶ 23 Horsehead initially contends that the appellate court erred when it reviewed the tax tribunal's determination that it was not entitled to the use tax exemption under a "clearly erroneous" standard of review. It argues that the proper standard should be *de novo* because the tax tribunal has neither rulemaking nor enforcement power with respect to any tax law and it does not qualify for deference to its decision.

¶ 24 The tax tribunal is an independent administrative tribunal. 35 ILCS 1010/1-5(a) (West 2012). Its function is to resolve disputes between the Department and taxpayers for specified tax liability for amounts exceeding $15,000. *Id.* § 1-45.

¶ 25 The Tax Tribunal Act specifically defines the tribunal as an independent administrative body "with tax expertise" that acts as a "tax-expert forum." *Id.* § 1-5(a), (c). In declaring the purpose of the tax tribunal, the legislature provided, in pertinent part:

> "To increase public confidence in the fairness of the State tax system, the State shall provide an independent administrative tribunal with tax expertise to resolve tax disputes between the Department of Revenue and taxpayers prior to requiring the taxpayer to pay the amounts in issue. By establishing an independent tax tribunal, this Act provides taxpayers with a means of resolving controversies that ensures both the appearance and the reality of due process and fundamental fairness." *Id.* § 1-5(a).

¶ 26 The tax tribunal thus has tax expertise by way of its statutory mandate. Additionally, the Tax Tribunal Act specifically requires that administrative law judges who serve on the tribunal have "substantial knowledge of State tax laws and the making of a record in a tax case." *Id.* § 1-30. Accordingly, we reject Horsehead's argument that no deference should be paid to a decision by the tribunal.

¶ 27 That said, the degree of deference afforded to a decision by the tax tribunal turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. See *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142 (2006). A conclusion on a question of law by the tax tribunal is reviewed *de novo*. *Id.* A court of review is not bound by the tribunal's interpretation of a statute, but its interpretation is relevant where there is reasonable debate about the statute's meaning. *Id.* A mixed question of law and fact is reviewed under the "clearly erroneous" standard. *Id.* at 143. Under that standard, the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or whether the rule of law as applied to the established facts is or is not violated. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391 (2001).

¶ 28 The issue here is whether the tax tribunal properly found the taxpayer was not entitled to the statutory use tax exemption because the coke did not effect a direct and immediate change on the manufactured product. This decision presents a mixed question of law and fact. Accordingly, the decision will be deemed "clearly erroneous" only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been

- 5 -

committed. *Schiller*, 221 Ill. 2d at 143; see also *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005).

¶ 29 Having determined the proper standard of review, we now turn to the central issue on appeal.

¶ 30                                    II. The Chemical Exemption

¶ 31 Horsehead contends that the tax tribunal erred by holding that its purchases of metallurgical coke did not qualify for the use tax chemical exemption found in section 3-50(4) of the Act.

¶ 32 As we noted earlier, use tax is imposed on the privilege of using in Illinois tangible personal property purchased at retail from outside the state. 35 ILCS 105/3 (West 2012). The purpose of the use tax is "primarily to prevent avoidance of the [sales] tax by people making out-of-state purchases, and to protect Illinois merchants against such diversion of business to retailers outside Illinois." *Performance Marketing Ass'n v. Hamer*, 2013 IL 114496, ¶ 3.

¶ 33 Under Illinois law, taxation is the rule, and exemption is the exception. See *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 388 (2010) (superseded by statute (see Pub. Act 97-688 (eff. June 14, 2012) (adding 35 ILCS 200/15-86))). The burden of establishing entitlement to a tax exemption rests upon the party seeking it. *Id.* The burden is a heavy one. *Id.* All facts are to be construed, and all debatable questions resolved, in favor of taxation. *Id.* If there is any doubt as to the applicability of an exemption, it must be resolved in favor of requiring that the tax be paid. *Id.*

¶ 34 Horsehead argues that it is entitled to the use tax chemical exemption because the coke it uses in the manufacturing process has the necessary "direct and immediate change" on the zinc and iron products it sells. Horsehead contends that the tax tribunal's interpretation and application of the provision is overly restrictive and improperly prohibits all "intervening factors or intermediate steps."

¶ 35 Turning to the statutory language at issue, section 3-5(18) of the Act contains an exemption from the use tax for the following manufacturing and assembling machinery and equipment:

> "Manufacturing and assembling machinery and equipment used primarily in the process of manufacturing or assembling tangible personal property for wholesale or retail sale or lease, whether that sale or lease is made directly by the manufacturer or by some other person, whether the materials used in the process are owned by the manufacturer or some other person, or whether that sale or lease is made apart from or as an incident to the seller's engaging in the service occupation of producing machines, tools, dies, jigs, patterns, gauges, or other similar items of no commercial value on special order for a particular purchaser." 35 ILCS 105/3-5(18) (West 2012).

¶ 36 Section 3-50 of the Act then contains a definition of "equipment" that includes certain chemicals:

> "Manufacturing and assembly exemption. The manufacturing and assembling machinery and equipment exemption includes machinery and equipment that replaces machinery and equipment in an existing manufacturing facility as well as machinery and equipment that are for use in an expanded or new manufacturing facility. *** For the purposes of this exemption, terms have the following meanings:
>
>                                         * * *

- 6 -

(4) 'Equipment' includes an independent device or tool separate from machinery but essential to an integrated manufacturing or assembly process ***. *Equipment includes chemicals* or chemicals acting as catalysts *but only if the chemicals* or chemicals acting as catalysts *effect a direct and immediate change upon a product being manufactured* or assembled for wholesale or retail sale or lease." (Emphases added.) *Id.* § 3-50(4).

¶ 37    The fundamental rule of statutory interpretation is to ascertain and effectuate the legislature's intent. *Comprehensive Community Solutions, Inc.*, 216 Ill. 2d at 473. The plain language of the statute remains the best indication of this intent. *Id.* Where the language of a statute is clear, we may not read into it exceptions that the legislature did not express, and we will give it effect as written. *Id.* We also will give undefined statutory terms their ordinary meanings. *Id.* at 473-74.

¶ 38    We find the terms "direct" and "immediate" in section 3-50(4) to be clear and unambiguous, so there is no need for us to resort to other aids of statutory construction. To be eligible for the use tax chemical exemption, the coke used by Horsehead in the manufacturing process must effect a change on the zinc and iron in the EAF dust at once and without any intermediate steps.

¶ 39    The Department's regulations on manufacturing machinery and equipment provide two examples of the types of chemicals that would qualify for the exemption. The only relevant example is the first:[3]

"A) Example 1. A chemical acid is used to etch copper off the surface of a printed circuit board during the manufacturing process. The acid causes a direct and immediate change upon the product. The acid qualifies for the exemption." 86 Ill. Adm. Code 130.330(c)(6)(A), amended at 29 Ill. Reg. 7004 (eff. Apr. 26, 2005).

Our interpretation of the chemical exemption is entirely consistent with this example where the acid, without first going through any intermediate chemical changes, directly and at once etches copper off the surface of the circuit board.

¶ 40    We reject Horsehead's argument that the definition of "proximate cause" should be used to define "direct" in the statute. That legal phrase is a tort concept that appears nowhere in section 3-50(4). This court cannot simply graft the term "proximate cause" onto the statute. This argument also ignores the word "immediate" that appears in the provision along with "direct." The few cases cited by Horsehead do not inform our decision in any way. They either involve an entirely different manufacturing process or concern dissimilar statutory language.

¶ 41    The tax tribunal concluded that the coke did not qualify for the exemption because it did not directly and immediately cause a change to the zinc or iron being sold by Horsehead. As Horsehead's own witness acknowledged, simply placing coke next to the solid oxide would not create any chemical reaction. It is undisputed that during the Waelzing process, which occurs over a period of hours, the coke combines with the carbon dioxide in the kiln and creates carbon monoxide. Following that reaction, the zinc oxidizes and leaves small particles of zinc oxide that are gathered and refined. The iron-rich material created during the process is also collected and sold. The witnesses also testified that carbon monoxide, not carbon from the

_____

[3]The second example concerns a catalyst that qualifies for the exemption and, therefore, does not inform our decision.

coke, is what reduces EAF dust to zinc oxide and iron oxide. At no time in the described chemical processes and reactions does the coke have a direct and immediate effect on the zinc or iron being manufactured.

¶ 42 Based upon the plain language of section 3-50(4), the legislature chose to limit the exemption to only those chemicals that effect a "direct and immediate change" on the final manufactured product. We reiterate that tax exemptions are to be strictly construed and that any doubts concerning the applicability of such exemption must be resolved in favor of taxation. See *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 216 (1989). As the tax tribunal recognized, the broad interpretation of the use tax chemical exemption urged by Horsehead would result in virtually any chemical used in the manufacturing process qualifying for the exemption.

¶ 43 For these reasons, we hold that the tax tribunal did not commit clear error in determining that Horsehead's coke purchases did not qualify for the use tax chemical exemption.

¶ 44 III. Imposition of Penalties

¶ 45 Finally, Horsehead contends that the tax tribunal's conclusion that it was not entitled to abatement of late payment and late filing penalties was against the manifest weight of the evidence.

¶ 46 The existence of reasonable cause justifying abatement of a tax penalty is a factual determination that is to be decided on a case-by-case basis. *Hollinger International, Inc. v. Bower*, 363 Ill. App. 3d 313, 315-16 (2005). If the record contains evidence to support the decision to impose penalties, it should be affirmed. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The determination as to whether reasonable cause exists in justifying the abatement of a tax penalty will be reversed if the decision was against the manifest weight of the evidence and if the opposite conclusion was clearly evident. *Id.*

¶ 47 Section 3-8 of the Uniform Penalty and Interest Act provides, in pertinent part:

"The penalties imposed under the provisions of Section[ ] *** 3-5 *** of this Act shall not apply if the taxpayer shows that his failure to file a return or pay tax at the required time was due to reasonable cause. Reasonable cause shall be determined in each situation in accordance with the rules and regulations promulgated by the Department." 35 ILCS 735/3-8 (West 2016).

¶ 48 The Department's regulation on what should be considered as reasonable cause to avoid penalties provides, in pertinent part:

"b) The determination of whether a taxpayer acted with reasonable cause shall be made on a case by case basis taking into account all pertinent facts and circumstances. The most important factor to be considered in making a determination to abate a penalty will be the extent to which the taxpayer made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion.

c) A taxpayer will be considered to have made a good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so. A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education. Accordingly, reliance on the advice

of a professional does not necessarily establish that a taxpayer exercised ordinary business care and prudence, nor does reliance on incorrect facts such as an erroneous information return." 86 Ill. Adm. Code 700.400(b), (c) (2001).

¶ 49 Horsehead contends that it satisfied the reasonable cause exception to abate the late filing and payment penalties. It asserts that the position it took on the use tax chemical exemption was not unreasonable due to the absence of any controlling case law or a specific statutory definition providing what it means to "effect a direct and immediate change" upon the product manufactured.

¶ 50 As the Department's regulation instructs, the determination of whether a taxpayer acted with reasonable cause is to be made on a case-by-case basis, taking into account all pertinent facts and circumstances. We initially note that the late filing and late payment fees imposed on Horsehead constituted almost a quarter of its overall liability to the Department. See generally *Abrahamson*, 153 Ill. 2d at 99 (holding that a court of review in determining whether a finding is against the manifest weight of the evidence should consider the severity of the sanction imposed). We also note that the tax tribunal recognized that the Department's audit file had been admitted into evidence and referenced Horsehead's history of tax compliance. The tribunal specifically held that the company had shown "good conduct" in complying with its tax obligations, which carried some weight in support of its claim that it acted in good faith when it failed to pay use tax on the coke.

¶ 51 The tax tribunal also acknowledged that the term "direct and immediate change" in the use tax chemical exemption has no specific statutory definition. Additionally, for the audit period at issue, there was no caselaw that Horsehead could have turned to for guidance as to how the chemical exemption should be interpreted and applied to the coke used in its manufacturing process. In denying Horsehead's requested relief, the tax tribunal relied, in large part, on the fact that the taxpayer did not present any witnesses or evidence to support its claim for taking the position that it did on the exemption. As Horsehead asserts, however, a taxpayer seeking abatement under the reasonable cause exception is not specifically required to produce such evidence of its decision-making process or show that it sought guidance on the issue. See 86 Ill. Adm. Code 700.400(b), (c) (2001).

¶ 52 For these reasons, and recognizing the unique factual circumstances surrounding the manufacturing process at issue in this case, we find the tax tribunal's decision to uphold the Department's imposition of late payment and filing penalties was against the manifest weight of the evidence.

¶ 53 CONCLUSION

¶ 54 Accordingly, we affirm that portion of the appellate court judgment affirming the imposition of tax liability on Horsehead, and we reverse that portion of the decision affirming the imposition of the late payment penalties and late filing penalties.

¶ 55 Appellate court judgment affirmed in part and reversed in part.

¶ 56 Tribunal decision affirmed in part and reversed in part.